UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David John Lawrence,

                    Plaintiff,                    Court File No. 14-cv-3398 (JNE/LIB)

        v.                                        **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

                    Defendant.


Plaintiff David John Lawrence ("Plaintiff") seeks judicial review of the decision of the Commissioner of Social Security ("Defendant") denying his application for disability insurance benefits (DIB). The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g).

Both parties submitted motions for summary judgment, [Docket Nos. 10, 13], and the Court took the matter under advisement on the written submissions. For the reasons discussed below, the Court recommends **DENYING** Plaintiff's Motion for Summary Judgment, [Docket No. 10], and **GRANTING** Defendant's Motion for Summary Judgment, [Docket No. 13].

I.      STATEMENT OF FACTS

        A.      Procedural History

        On August 30, 2011, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1385. (Tr. 14).[1] Plaintiff initially claimed that he had become disabled on January 2, 2006. (Tr. 14).

---

[1] Throughout this Report and Recommendation, the Court refers to the Administrative Record, [Docket No. 9], by the abbreviation "Tr."

The date on which Plaintiff last met the insured status requirements of the Social Security Act was June 30, 2013. (Tr. 16). The Commissioner denied Plaintiff's claim on December 14, 2011, and denied Plaintiff's Request for Reconsideration on May 3, 2012. (Tr. 14). Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 14). Pursuant to Plaintiff's request, ALJ Virginia Kuhn conducted a hearing on June 17, 2013, at which Plaintiff and William E. Villa, an independent vocational expert, testified. (Tr. 14). On the record at the hearing, Plaintiff amended his alleged onset date to February 17, 2011. (Tr. 14). On July 19, 2013, the ALJ issued a decision denying Plaintiff's request for benefits, in which she concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 26). Plaintiff sought review of the decision by the Appeals Council. (Tr. 1-8). The Appeals Council denied Plaintiff's request for review. (Tr. 1). As such, the ALJ's decision became the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481. On September 8, 2014, Plaintiff filed the present action. (Compl. [Docket No. 1]).

**B.     Factual History**

Plaintiff was born on February 17, 1961. (Tr. 24). Plaintiff has at least a high school education and can communicate in English. (Tr. 24). Plaintiff has worked in the past as a construction worker, a cabinet assembler, and a skylight installer. (Tr. 63-64). Since October of 2010, Plaintiff has worked as an automobile transporter. (Tr. 24). However, Plaintiff's work did not generate sufficient income to be considered substantial gainful activity between February 17, 2011, the amended alleged onset date of Plaintiff's alleged disability, and June 30, 2013, the last date on which Plaintiff met the insured status requirements of the Social Security Act. (Tr. 16).

In his application for benefits, Plaintiff stated that his ability to work was limited by two previous heart attacks, unidentified issues in his left arm from a previous injury, arthritis in both hands, broken bones in his right hand, tendonitis surgery on his right wrist, right shoulder surgery, trouble sleeping, racing thoughts, Barrett's esophagus, unspecific pain, dizziness, major headaches, unidentified blood pressure issues, sciatic nerve damage in his lower abdomen, cholesterol, allergies, multiple sinus surgeries, depression, and anger issues. (Tr. 192).

At the administrative hearing, Plaintiff testified that he could not work during the period of alleged disability because he sporadically experienced debilitating pain in his hip, right shoulder, and hands; that he has pain and broken bones in his right wrist; that he has difficulty twisting his left arm; that he has pain in his esophagus; that he has a curvature of the spine; that his pain is made worse by heat; that his pain medications make him sick; and that he has trouble with his memory. (Tr. 39-47). Plaintiff also testified that he has emotional problems and ADHD. (Tr. 48-49). Plaintiff further testified that his pain negatively affects his ability to walk long distances, climb stairs, sit for long periods, and stand for more than a few hours; that he could lift only lightweight objects; that he cannot lift his right hand above his head; that he has trouble shaking hands, opening the lids of containers, and using cutlery; that he has trouble turning the ignition keys of vehicles; that he had stopped cutting wood for a woodstove at his residence eight years prior to the hearing; and that he gets rashes from his medications. (Tr. 39-50, 52). Plaintiff also testified that he can wash his own hair using his left hand, and that his daily activities included helping with household chores such as grocery shopping, drying dishes, folding clothes, and making beds. (Tr. 41, 44, 59).

The ALJ orally noted on the record at the evidentiary hearing that most of Plaintiff's testimony was inconsistent with other evidence in the record, and questioned Plaintiff about

specific aspects of his testimony. (Tr. 51, 54-60). In response to the ALJ's questions about an examination note dated April 7, 2011, that indicated that Plaintiff had told his cardiologist that he cut his own wood, Plaintiff testified that he had stopped loading chopped wood into his woodstove three years before the hearing and had told the cardiologist that he did not cut wood. (Tr. 54-56). In response to the ALJ's questions regarding Plaintiff's social habits, Plaintiff first testified that he didn't socialize with friends at all during the period of alleged disability, then testified that he had visited the homes of friends approximately twice per week during that period. (Tr. 60-61).

### C.     Medical Evidence in the Record

On October 12, 2004, Plaintiff saw Dr. Ramesh Chawla for lab work with regard to a heart attack that Plaintiff had suffered in February of 2004. (Tr. 280-88). Plaintiff also reported having had a heart attack in December of 2000. (Tr. 280). Dr. Chawla noted that Plaintiff had not followed up on the treatment for his February 2004, heart attack. (Tr. 280).

On February 7, 2005, Plaintiff saw Dr. David Weinberg for an upper GI endoscopy. (Tr. 266-267). Dr. Weinberg diagnosed Plaintiff with Barrett's esophagus and a hiatal hernia. (Tr. 266).

On April 27, 2007, Plaintiff saw Dr. Robert Ganz for an upper GI endoscopy. (Tr. 360). Dr. Ganz diagnosed Plaintiff with Barrett's esophagus, Schatzski's ring, and a hiatal hernia. (Tr. 360).

On May 11, 2007, Plaintiff saw Dr. Gina Storrs for a follow up regarding his Barrett's esophagus and gastroesophageal reflux disease. (Tr. 364).

On July 24, 2007, Plaintiff was seen at the Foley Medical Center. (Tr. 289-90). Plaintiff was diagnosed with right wrist De Quervain's tendonitis and approved for eight sessions of

physical therapy. (Tr. 289-90). Plaintiff did not attend the first two scheduled physical therapy sessions. (Tr. 296). Between August 7 and August 10, 2007, Plaintiff attended three physical therapy sessions, after which he reported that his pain was not improving, and stopped attending physical therapy. (Tr. 296-297).

On March 12 and March 19, 2010, Plaintiff was seen by Dr. Andrew Staiger at St. Cloud Orthopedic Associates for evaluations of his pain and difficulty using his right wrist and hand, (Tr. 271-74); Plaintiff reported pain in his right wrist that worsened with periods of extended use. (Tr. 272). Dr. Staiger noted Plaintiff's history of right wrist De Quervain's tenosynovitis, and Dr. Staiger further noted that Plaintiff was not in acute distress, had no swelling in the right wrist or right thumb, and was able to make a fist with his right hand and fully extend the fingers and thumb of that hand without difficulty. (Tr. 272-73).

On April 6, 2010, Plaintiff saw Dr. Kevin Stiles for pain and weakness in his left shoulder due to a snowmobile accident. (Tr. 276). Dr. Stiles noted that Plaintiff had a full range of motion in his left shoulder but was reporting extreme tenderness in that shoulder. (Tr. 276).

On April 9, 2010, Plaintiff was seen at St. Cloud Orthopedic Associates by a Dr. Geiser for an evaluation. (Tr. 269-70). Plaintiff reported experiencing left rotator cuff tendonitis pain, occasional mild diffuse numbness and tingling on his left side which were resolving, and resolving neck pain. Dr. Geiser noted that Plaintiff was not in acute distress and had full range of motion in his left shoulder, with mild impingement and mild discomfort in that shoulder. (Tr. 269). Dr. Geiser also noted that Plaintiff had a good range of motion in his neck. (Tr. 269).

On June 7, 2010, Plaintiff saw Dr. Stiles regarding insomnia, pain in his stomach, weight loss, dizziness, and night sweats. (Tr. 277). Dr. Stiles noted that had hiatal hernia, esophageal

stricture, and Barrett's esophagus. (Tr. 277). Plaintiff's chest x-rays and blood tests appeared normal. (Tr. 277).

On April 7, 2011, Plaintiff saw Dr. Richard Backes regarding his history of coronary disease. (Tr. 311-15). Dr. Backes recorded that Plaintiff had done well after his 2004 heart attack and had remained active. (Tr. 311). Dr. Backes recorded that Plaintiff told him that he cuts his own wood. (Tr. 311). Dr. Backes recorded that Plaintiff had absolutely no angina or active failure symptoms and no syncope, presyncope, or other significant palpitations. (Tr. 311). Dr. Backes also noted that a complete review of Plaintiff's systems indicated only that Plaintiff had temporarily experienced bilateral foot pain. (Tr. 312). Diagnostic exams indicated unremarkable HEENT results, the absence of neck nodes, a normal carotid upstroke without bruit, a flat JVP, clear lungs, a normal S1 and S2 without significant murmur or gallop, no cyanosis or pallor, no peripheral edema, and no peritoneal signs in Plaintiff's abdomen. (Tr. 312).

On August 19, 2011, Plaintiff saw Dr. Melissa Ensign for an evaluation of his left shoulder. (Tr. 324-26). Plaintiff reported experiencing continuous pain in his neck and left shoulder, and occasional numbness and tingling in his left hand. (Tr. 324). The results of Plaintiff's physical examination indicated that Plaintiff generally had good muscle strength and tone and appeared well-nourished, well-developed, and not in acute distress; that Plaintiff's left and right shoulders were normal, not tender to palpation, and had normal ranges of motion, but that Plaintiff was experiencing a popping sensation in his left shoulder at the extremes of his range of motion. (Tr. 326).

On August 31, 2011, Plaintiff saw Dr. Ensign, for neck pain. (Tr. 317-20). Plaintiff reported feeling intermittent severe neck pain, an inability to turn his neck, severe left shoulder pain, and had bumps on his right hand. (Tr. 317). Dr. Ensign assessed Plaintiff as having a sprain

in his neck. (Tr. 319). An MRI of Plaintiff's left shoulder indicated that Plaintiff had mild to moderate tendinopathy involving his supraspinatus tendon, mild tendinopathy in the subscapularis tendon, mild generalized subacromial/subdeltoid bursitis, mild narrowing of the anterior acromiohumeral space, and mild AC joint arthrosis without osseous encroachment in the supraspinatus outlet. (Tr. 323).

On September 26, 2011, Plaintiff saw Dr. Stiles for a medical opinion regarding his functional capacity for work-related activities. (Tr. 328-31). Dr. Stiles opined that Plaintiff could lift less than ten pounds occasionally and could not do lifting on a frequent basis; could stand less than two hours continuously; could sit approximately two hours with fifteen-minute breaks before changing his posture; and would need to lie down two to four times at unpredictable intervals during a work shift. (Tr. 328-29). Dr. Stiles also opined that Plaintiff could never twist, kneel, stoop, crouch, crawl, climb ladders, balance, rotate or flex his neck; could occasionally climb stairs and operate repetitive foot controls with his left foot; and could frequently operate repetitive foot controls with his right foot. (Tr. 329). Dr. Stiles opined that Plaintiff's impairments negatively affected his ability to do gross manipulation but did not affect Plaintiff's abilities to engage in reaching, fingering, feeling, pushing and pulling. (Tr. 330). Dr. Stiles concluded that Plaintiff could never engage in gross or fine manipulation due to his impairments. (Tr. 330). Dr. Stiles also indicated that Plaintiff should avoid concentrated exposure to wetness, humidity, and vibration; avoid moderate exposure to extreme cold, noise, and fumes; and avoid all exposure to extreme heat and fumes. (Tr. 330).

In his notes regarding the visit, Dr. Stiles noted that Plaintiff had increasing trouble with joint pains, muscle pain and weakness, short and long term memory issues, attention deficit disorder and artherosclerotic cardiovascular disease, and was at a point where he was unable to

maintain any employment. (Tr. 333). Dr. Stiles also recorded that Plaintiff was well-appearing, well-nourished, and not in distress and that a physical examination indicated that pressure points on Plaintiff's neck were significantly tender, pressure points in his chest were moderately tender to palpation, and that Plaintiff had bilateral paralumbar, parathoracic, and buttocks tenderness, moderately decreased extension and lateral bending, and significantly decreased rotation, but that the results were otherwise unremarkable. (Tr. 334).

On October 5, 2011, Plaintiff saw Dr. Thomas Balfanz, for an initial examination and cervical report regarding his back pain. (Tr. 341-45). Plaintiff reported experiencing continuous pain in his neck and back, significant right shoulder "issues", pain and numbness in the left axillary region, and bumps in his lower back. (Tr. 341). Dr. Balfanz noted that Plaintiff was able to move fairly easily around the room with a normal gait, walked without difficulty, and stood in a normal upright position. (Tr. 343). Dr. Balfanz noted that Plaintiff's range of motion in his back was at or below normal for flexion, extension, and right and left side bending. (Tr. 343). Dr. Balfanz's palpation exam indicated that Plaintiff had low lumbar tenderness but was otherwise unremarkable. (Tr. 343). The examination of Plaintiff's lower extremities was unremarkable. (Tr. 343). Straight leg raise tests indicated a 20 degree reduction in Plaintiff's right straight leg raise and a 30 degree reduction in Plaintiff's left straight leg raise. (Tr. 343). Plaintiff's range of motion in his neck was below normal in right and left side bending and right and left rotation. (Tr. 343). Strength testing indicated that Plaintiff's grip and pinch strength on both hands was rated 4/5, but that Plaintiff's finger abduction, wrist flexion, wrist extension, elbow extension, and shoulder extension were all rated 5/5. (Tr. 343). Dr. Balfanz noted that the sensation in Plaintiff's right arm was normal but the sensation in his left arm was disturbed on the lateral border of the hand, and that Plaintiff had tenderness in the right and left paracervical, right and

left trapezius, and interscapular muscles. (Tr. 344). Dr. Balfaz diagnosed Plaintiff with mechanical low back pain, non-specific cervical spine pain, non-specific thoracic pain, and deconditioning syndrome. (Tr. 344). Dr. Balfanz indicated that the prognosis for Plaintiff to improve his functioning was good and recommended that Plaintiff attend physical therapy for nine to twelve weeks. (Tr. 344-45).

On October 11, 2011, Dr. Stiles wrote a letter opining that Plaintiff had become completely disabled by his medical impairments. (Tr. 337).

On November 2, 2011, Plaintiff saw Dr. Balfanz after having attended three rehabilitation sessions. (Tr. 340). Dr. Balfanz noted that Plaintiff's physical therapy sessions had improved Plaintiff's strength and range of motion in his back and neck. (Tr. 340). Plaintiff reported that he was discontinuing physical therapy due to cost. (Tr. 340).

On November 30, 2011, Plaintiff saw Dr. Ensign for neck, back, and left shoulder pain. (Tr. 347-49). Plaintiff reported that he had attended three sessions of physical therapy and, although his pain was alleviated by a physical therapy brace, he saw no improvement and was discontinuing the physical therapy due to cost. (Tr. 348).

On December 12, 2011, disability adjudicator Sarah Mandile issued a disability determination explanation supporting the Commissioner's initial denial of Plaintiff's application for disability benefits. (Tr. 73-86). That disability determination explanation contained an assessment of Plaintiff's impairments by state agency medical consultant Dr. Charles Grant. (Tr. 79-85). Dr. Grant's assessment indicates that he had considered the severity of plaintiff's impairments with respect to Listings 1.02 (major joint dysfunction), 4.04 (ischemic heart disease), and 12.04 (affective disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 80). Dr. Grant indicated his opinion that it was necessary to do a residual functional capacity (RFC)

assessment of Plaintiff. (Tr. 80). Dr. Grant's RFC assessment of Plaintiff indicates that Plaintiff can lift twenty-five pounds frequently and fifty pounds occasionally; can stand and sit six hours during an eight hour workday; and has no postural, visual, manipulative, or communicative limitations. (Tr. 81-82). Dr. Grant signed his assessment on November 30, 2011.

Between February 13 and April 24, 2012, Plaintiff saw Dr. Theodore Truitt five times in relation to his sinuses. (Tr. 351-55, 380-85). Dr. Truitt diagnosed Plaintiff with a severely deviated septum, nasal polyposis, and chronic sinusitis. (Tr. 354). During a visit on March 21, 2012, Plaintiff underwent surgery to remove polyps from his nasal cavity. (Tr. 371-79).

On April 24, 2012, Plaintiff saw Dr. Ensign for a follow up regarding his coronary artery disease. (Tr. 386-90). Dr. Ensign noted that Plaintiff remained active, had absolutely no angina or congestive failure symptoms, and had no syncope, presyncope, or palpitations. (Tr. 387). The results of a physical examination were unremarkable. (Tr. 387).

On May 2, 2012, disability adjudicator Shannon Erickson issued a disability determination supporting the Commissioner's denial of Plaintiff's application for disability benefits on reconsideration. (Tr. 87-100). That disability determination explanation contained an assessment of Plaintiff's impairments by state agency medical consultant Dr. Steven Richards. (Tr. 92-96). Dr. Richards' assessment indicates that he also considered the severity of Plaintiff's impairments with respect to Listings 1.02 (major joint dysfunction), 4.04 (ischemic heart disease), and 12.04 (affective disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 94). Dr. Richards also indicated his opinion that it was necessary to do a residual functional capacity (RFC) assessment of Plaintiff. (Tr. 94). Dr. Richards' RFC assessment of Plaintiff indicates that Plaintiff can lift twenty-five pounds frequently and fifty pounds occasionally; can stand and sit

six hours during an eight hour workday; and has no postural, visual, manipulative, or communicative limitations. (Tr. 95-96). Dr. Richards signed his assessment May 1, 2012.

On August 29, 2012, state agency medical consultant Dr. Nancy Armstrong of the Dallas Disability Process Unit completed an analysis of Plaintiff's case. (Tr. 391-93). Dr. Armstrong reviewed Plaintiff's medical records, noted that they indicated that Plaintiff maintained a very active lifestyle and opined that the medical records did not support a sedentary residual functional capacity determination or a finding that Plaintiff was disabled. (See Tr. 392).

On October 22, 2012, Plaintiff saw Dr. Stiles for mild ankle pain and moderate hip pain. (Tr. 395-98). Dr. Stiles noted that Plaintiff was well-appearing, well nourished, and not in distress. (Tr. 396).

On April 22, 2013, Plaintiff again saw Dr. Stiles for completion of disability paperwork. (Tr. 401-10). Dr. Stiles reaffirmed his previous recommendations regarding Plaintiff's functional capacity from September 26, 2011. (Tr. 401). In his treatment notes, Dr. Stiles indicated that Plaintiff was chronically ill-appearing, but well nourished, alert, and ambulating without difficulty. (Tr. 402). Dr. Stiles also noted that Plaintiff's musculoskeletal results indicated a normal symmetry, tone, strength and range of motion, with no effusions instability to tenderness to palpation, but that Plaintiff had diffuse muscle pain. (Tr. 402). Dr. Stiles wrote a second letter on that date, indicating his opinion that Plaintiff was completely disabled. (Tr. 402).

### D.  Hearing Testimony and Statements

At the administrative hearing, the ALJ took testimony from Plaintiff, and William E. Villa, an independent vocational expert. Plaintiff testified as reported above in part I.B., *supra*.

The ALJ initially asked the independent vocational expert, William Villa, to set forth Plaintiff's past relevant work. Villa testified that Plaintiff had past light, semi-skilled work as a

cabinet assembler; some heavy, unskilled past work as a construction laborer; some medium, semi-skilled past work as a skylight installer; some medium past work as a siding applicator; and some past light, skilled work as an automobile transporter. (Tr. 63-64).

The ALJ then questioned Villa, prefacing the questions with:

So Mr. Villa, if you would please consider an individual categorized by our age categories in the Regulations as closely approaching advanced age with a GED high school equivalent education and the past relevant work with respect to cabinet assembler, construction laborer, skylight installer, siding applicator, and auto transporter as set for[th] in your testimony and analysis, who is limited to the light exertional range as defined in the Regulations and Dictionary of Occupational Titles, with no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, no work at heights or with hazards or hazardous machinery, and occasional overhead reaching bilaterally. Just within this initial set of limitations would it allow for any of the past relevant work?

(Tr. 65).

Villa provided opinion testimony that a hypothetical person with those qualities and restrictions could perform Plaintiff's prior jobs as a cabinet assembler and auto transporter as performed as described in the Dictionary of Occupational Titles. (Tr. 65). Villa also testified that a person with those qualities and restrictions could also perform unskilled light work such as inspection, of which there are at least 1,400 positions in Minnesota; assembly work, of which there are at least 2,900 positions in Minnesota; or food packer/re-packer, of which there are at least 3,500 positions in Minnesota. (Tr. 65-66).

The ALJ posed additional questions to Mr. Villa, prefacing the questions with:

All right, and if I were to further limit this individual to no power gripping or power grasping, if at all, would that impact your testimony with respect to past relevant work for the occupations you've set forth?

Villa provided opinion testimony that a hypothetical person with the initially described qualities and restrictions and the additional restriction of no power gripping or power grasping

would not be able to perform Plaintiff's past relevant work as a cabinet assembler but could perform Plaintiff's past relevant work as an auto transporter. (Tr. 66-67). Villa also testified that such a hypothetical person could also perform unskilled light work such as inspection, of which there are at least 1,400 positions in Minnesota; assembly work, of which there are at least 2,900 positions in Minnesota; or food packer/re-packer, of which there are at least 3,500 positions in Minnesota. (Tr. 67).

### E. The ALJ's Decision

The ALJ ultimately held that Plaintiff had not been disabled within the meaning of the Social Security Act from February 17, 2011, through June 30, 2013, the date Plaintiff was last insured. (Tr. 25).

In reaching her decision, the ALJ followed the required five-step sequential analysis, namely: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient residual functional capacity to return to his past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. (Tr. 14-25); 20 C.F.R. §§ 404.1520(a)-(f), 416.920.

At step one of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period beginning with his alleged onset date of February 17, 2011, through June 30, 2013, the date on which Plaintiff was last insured. (Tr. 16); 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq.

At step two, the ALJ determined that Plaintiff had the following severe impairments: coronary artery disease, history of right wrist De Quervain's tenosynovitis, neck sprain, left rotator cuff syndrome, and mild findings in the left shoulder. (Tr. 16); 20 C.F.R. §§ 404.1520(c),

416.920(c). The ALJ also found that Plaintiff had the following non-severe medically determinable physical impairments: Barrett's esophagus, hyperlipidemia, hypertension, deviated septum, nasal polyposis, Schatzski's ring, headaches, and hiatal hernia. (Tr. 16). The ALJ found that Plaintiff had a medically determinable mental impairment of depression that was non-severe, (Tr. 17). The ALJ found that Plaintiff also had mental impairments of ADHD and poor memory that were not medically determinable. (Tr. 18).

At step three, the ALJ determined that Plaintiff's impairments, considered alone or in combination, did not meet or medically equal the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18). The ALJ concluded that Plaintiff's neck sprain did not medically equal a disorder of the spine listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04. (Tr. 18). The ALJ also concluded that Plaintiff's left rotator cuff and right wrist injuries did not meet or medically equal a major dysfunction of a major peripheral joint under Listing 1.02B, reasoning that the available medical evidence indicated that Plaintiff is able to perform fine and gross movements effectively. (Tr. 19). The ALJ further concluded that Plaintiff's heart disease did not meet or medically equal a cardiovascular disorder under Listing 4.00 because the record did not include evidence of requisite exercise test scores, severely diminished left ventricular ejection fraction, or angioplastic evidence of severe stenosis or obstruction of the coronary arteries. (Tr. 19).

At step four, the ALJ determined that Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following specific limitations: occasional climbing of ramps and stairs, no climbing of ropes, ladders, or scaffolds, occasional balancing, stooping, kneeling, crouching, and crawling, no work at heights or hazards

or hazardous machinery, occasional overhead reaching bilaterally, and no power gripping or power grasping. (Tr. 19).

In making the RFC determination, the ALJ employed a two-step process. (Tr. 19). First, the ALJ asked whether there were underlying medically determinable physical or mental impairments that could reasonably be expected to produce the claimant's pain or other symptoms. (Tr. 19). Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms was shown, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limited the claimant's ability to work. (Tr. 19). In making a credibility finding regarding Plaintiff's statements about the limiting effects of his impairments, the ALJ considered the entire case record as a whole. (Tr. 19). The ALJ, consistent with 20 C.F.R. § 404.1529, SSRs 96-4p and 96-7p, also considered all of Plaintiff's alleged symptoms and whether they were consistent with the objective medical evidence and other evidence. (Tr. 19). The ALJ also considered opinion evidence in accord with 20 C.F.R. § 404.1527, SSRs 96-2, 96-5, 96-6, and 06-3p. (Tr. 19).

Starting with the first prong of step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms. (Tr. 23).

In evaluating the medical evidence in the record, the ALJ expressly gave little weight to the opinions of Plaintiff's treating physician, Dr. Stiles, noting that Dr. Stiles' opinions were unsupported by his own medical records and citing to specific examples of apparent inconsistencies in those records.[2] (Tr. 21-22). The ALJ also gave little weight to the opinions of

---

[2] The ALJ noted that, after two visits with Plaintiff for the purpose of assisting Plaintiff in obtaining Social Security benefits, Dr. Stiles recorded that Plaintiff was experiencing "numerous disabling symptoms" but also recorded that Plaintiff was "well appearing and in no distress." (Tr. 21). The ALJ also noted that the results of many of Plaintiff's tests were normal, which was inconsistent with Dr. Stiles' opinion that Plaintiff was completely disabled. (Tr. 21-

the state agency medical consultants, which were included in the initial denial of Plaintiff claim and the denial upon reconsideration, to the extent those opinions indicated that Plaintiff had the residual functional capacity to do medium intensity work.[3] (Tr. 23; <u>see also</u> Tr. 81-85, 95-99). The ALJ gave greater weight to the opinion of Dr. Armstrong, who opined that Plaintiff could do more than sedentary work as had been indicated by Dr. Stiles.[4] (Tr. 23).

   In considering the medical evidence available in the record, the ALJ noted that Plaintiff had suffered heart attacks in 2000 and 2004, but that Plaintiff's more recent medical records indicated that Plaintiff had done well following the implantation of a stent in 2004, with normal cardiac exam results, and a history of remaining active, including cutting his own wood. (Tr. 20). The ALJ also noted that Plaintiff was seen in March, 2010, for a right wrist condition, in April, 2010, for mild cuff tendonitis, and in April, 2011, for neck and shoulder pain. (Tr. 20). The ALJ noted that Plaintiff's test results from the period of alleged disability were generally unremarkable; that Plaintiff had been treated with over-the-counter pain medication, Metroprolol, and Niaspan; and that side effects from Plaintiff's medications appeared mild and did not interfere with Plaintiff's ability to work. (Tr. 20-21). The ALJ also noted that Plaintiff had been treated with physical therapy, the prognosis of which was good, and that Plaintiff had shown signs of improvement when he would actually attend his therapy sessions. (Tr. 20-21).

22). The ALJ further noted that Dr. Stiles' RFC recommendation was internally inconsistent in that it indicated that Plaintiff should have no limits for fingering and reaching but also indicated that Plaintiff should be limited to "no fingering due to neuropathy." (Tr. 22). The ALJ further noted that it appeared that Dr. Stiles had relied very heavily and uncritically on Plaintiff's subjective reports of his own symptoms. Finally, the ALJ noted that the two letters Dr. Stiles had written opining that Plaintiff was disabled were both conclusory and unsupported by specific medical evidence. (Tr. 22).

[3] At the initial stage, Dr. Grant reviewed the severity of Plaintiff's mental and psychological impairments and indicated his opinions that it was necessary to do a residual functional capacity assessment in this case. (Tr. 81-85). At the reconsideration stage, Dr. Richards also reviewed the severity of Plaintiff's mental and psychological impairments and indicated his opinions that it was necessary to do a residual functional capacity assessment in this case. (Tr. 95-99).

[4] Like Dr. Grant and Dr. Richards, Dr. Armstrong concluded that the medical evidence in the record did not support a conclusion that Plaintiff was disabled. (<u>See</u> Tr. 392).

At the second prong, the ALJ concluded that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his own symptoms were not credible to the extent that the statements were inconsistent with the objective medical evidence in the record. (Tr. 23). The ALJ noted that Plaintiff had a history of seeking minimal treatment and discontinuing physical therapy despite showing improvement, which the ALJ found to be inconsistent with Plaintiff's statements that his impairments were disabling. (Tr. 23). The ALJ also found that some of Plaintiff's statements were questionable and inconsistent with other objective evidence in the record, *i.e.*, Plaintiff's statement to Dr. Backes in 2011 that he had been cutting his own wood was inconsistent with his testimony at the hearing indicating that he was significantly physically impaired; Plaintiff's explanation that he had discontinued physical therapy due to cost was questionable as there was no evidence that Plaintiff had requested low or no cost treatment options; and Plaintiff's indication the he was ready to work by applying for and accepting unemployment benefits during the period of disability was inconsistent with his statements regarding the limiting effects of his impairments.

Relying on the testimony of the independent vocational expert, William Villa, who opined that a hypothetical individual as described at the hearing by the ALJ would be able to perform Plaintiff's past relevant light work as an automobile transporter, the ALJ determined that Plaintiff is able to perform his past relevant work. (Tr. 24). Because the ALJ concluded that there were other jobs in the national economy that Plaintiff could perform, however, the ALJ went on to make alternative findings at the fifth step of the analysis. (Tr. 24).

At step five of the analysis, the ALJ determined that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are still jobs that exist in significant numbers in the national economy that Plaintiff would be able to perform. (Tr. 24).

The ALJ again relied on the independent vocational expert who testified that a hypothetical individual with Plaintiff's limitations as described by the ALJ at the hearing would be able to perform the requirements of representative occupations such as inspection, of which there are at least 1,400 light unskilled jobs in Minnesota; assembly, of which there are at least 2,900 light unskilled jobs in Minnesota; and food packer/re-packer, of which there are at least 3,500 light unskilled jobs in Minnesota. (Tr. 25). The ALJ ultimately concluded that Plaintiff is not disabled as defined by the Social Security Act. (Tr. 26).

## II.    STANDARD OF REVIEW

Congress created standards for determining whether a claimant is entitled to Social Security disability benefits. There are several benefits programs under the Act, including the DIB Program of Title II (42 U.S.C. §§ 401 et seq.) and the SSI Program of Title XVI (42 U.S.C. §§ 1381 et seq.). "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, an individual's impairments must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). Substantial evidence means more than a scintilla, but less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). The substantial evidence test requires "more than a mere search of the record for evidence

supporting the [Commissioner's] findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195 1199 (8th Cir. 1987)). Rather, the court "must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." Id.

## III.    DISCUSSION

The parties have filed cross motions for summary judgment. [Docket Nos. 10, 13]. Plaintiff does not dispute the ALJ's determination at the first step of the analysis that he had not engaged in substantial gainful activity during the period between February 17, 2011, and June 30, 2013, the date on which he was last insured. (Plf.'s Mem., [Docket No. 11], 9). Nor does Plaintiff dispute the ALJ's determinations at the second step regarding the medically

determinable nature and severity, or lack thereof, of his mental and physical impairments. (Id.). In addition, Plaintiff affirmatively acknowledges that, considered individually, his mental and physical impairments do not meet or medically equal a disorder listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 11). Plaintiff, however, argues the ALJ incorrectly held that his impairments did not meet or medically equal a listed disorder when considered in combination; erred in formulating Plaintiff's RFC; and erred in determining that Plaintiff could perform work existing in significant numbers in the national economy. (See Id. at 9).

The Commissioner contends that she is entitled to summary judgment, arguing that each of Plaintiff's arguments are unavailing and the ALJ's opinion is supported by substantial evidence in the record. (Def.'s Mem., [Docket No. 14] at 1-2).

**A.      Medical Equivalence to a Listed Disorder.**

Plaintiff first contends that the ALJ's determination that his impairments did not meet or medically equal a listed medical disorder when considered in combination was not supported by substantial evidence in the record. Plaintiff argues that the ALJ failed to fairly and fully develop the record by not obtaining an updated opinion of an independent medical expert, and that the determination was not otherwise supported by substantial evidence in the record as whole.

1.      The ALJ Fairly and Fully Developed the Record

An ALJ has an independent duty to fairly and fully develop the record. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) (citing Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). In support of his position that the ALJ was required to obtain the testimony of an independent medical expert in this case, Plaintiff cites to Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council, SSR 96-6P (S.S.A.

July 2, 1996) ("SSR-96-6P"), a policy statement by the Social Security Administration regarding the consideration at the administrative law judge level of findings made by state agency medical consultants.

In pertinent part, SSR-96-6P sets forth that, while an ALJ remains the ultimate decision maker regarding the legal question of whether particular impairments meet or medically equal a listed disorder, Social Security Administration policy requires an ALJ to receive into evidence the expert opinion on that issue by an appointed physician, which the ALJ must consider and give appropriate weight. Id. at 3. The independent expert medical opinion requirement may be satisfied by documents, including a disability determination and transmittal form, signed by a state agency medical consultant that ensures that an independent medical expert's opinion regarding the issue of medical equivalence was obtained at the initial and reconsideration levels of review.  Id.

> However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert[] in the following circumstances:
>
> * When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> * When additional medical evidence is received *that in the opinion of the administrative law judge* or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

Id. at 3-4 (emphasis added).

The record presently before the Court contains two disability determination explanation forms, one dated December 12, 2011, communicating the denial of Plaintiff's claim in the first instance, (Tr. 73-85), and a second dated May 2, 2012, communicating the denial of Plaintiff's claim on reconsideration. (Tr. 86-100). Both forms contain signatures of state medical

consultants, Dr. Grant and Dr. Richards, indicating that a residual functional capacity determination was necessary in the present case, (Tr. 80, 94); a step only necessary if a claimant's impairments do not meet or are not medically equivalent of a listed disabling medical condition. See 20 C.F.R. § 404.1520 (if a claimant is found to be disabled at one step of the analysis, the ALJ need not go on to the next step).

The record before the ALJ contained additional medical records that were created after the date those two disability determination forms were signed by Dr. Grant and Dr. Richards. Accordingly, Social Security Administration policy required the ALJ to obtain an updated opinion of an independent medical expert *only if* the additional evidence, *in the opinion of the ALJ,* may have changed Dr. Grant's and Dr. Richards' findings that Plaintiff's impairments were not equivalent in severity to any listed impairment. SSR-96-6P.

The additional medical records available to the ALJ were an analysis of Plaintiff's Social Security case done by Dr. Armstrong, to whose opinion the ALJ gave great weight, and medical reports from Dr. Stiles, to whose opinion the ALJ gave little weight. The medical records from Dr. Stiles included records from a visit with Plaintiff on October 22, 2012, for mild ankle pain and moderate hip pain, and an examination of Plaintiff on April 23, 2013, in which Dr. Stiles reaffirmed his previous September 26, 2011, opinion that Plaintiff was completely disabled. The analysis of Plaintiff's Social Security case done by Dr. Armstrong, like the opinions of Dr. Grant at the initial determination stage and Dr. Richards at the reconsideration stage, indicated that her review of Plaintiff's medical history did not support a finding of disability. (Tr. 392). In light of the foregoing and the fact that there is no indication that the ALJ took any steps to obtain updated testimony by an independent medical expert, the Court concludes that ALJ was <u>not</u> of the opinion that the additional medical evidence in the record before her would have changed the

Dr. Grant's and Dr. Richards' previous opinions that Plaintiff's impairments did not meet or medically equal a listed disorder. Accordingly, the Social Security Administration policy set forth in SSR-96-6P did <u>not</u> require the ALJ to obtain an updated opinion by an independent medical expert regarding whether Plaintiff's impairments met or medically equaled a listed impairment.

    2.  <u>Substantial Evidence Supports the ALJ's Medical Equivalence Determination</u>

Plaintiff next argues that the ALJ's determination that his impairments did not meet or medically equal a listed disorder when considered in combination was not supported by substantial evidence in the record, asserting that his impairments when considered in combination medically equaled Listing 1.02 with regard to the chronic pain and stiffness in Plaintiff's left shoulder.

In pertinent part, Listing 1.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1, sets forth the following:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> . . . . .
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), *resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.*

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added).

"To qualify for disability under a listing, a claimant carries the burden of establishing that his condition meets or equals all specified medical criteria." <u>McCoy v. Astrue</u>, 648 F.3d 605, 611-12 (8th Cir. 2011) (citing <u>Marciniak v. Shalala</u>, 49 F.3d 1350, 1353 (8th Cir. 1995)). The

ALJ expressly concluded that Plaintiff's left rotator cuff and right wrist injuries were not medically equivalent to a major peripheral joint dysfunction under Listing 1.02B, reasoning that the available medical evidence indicated that Plaintiff is able to perform fine and gross movements effectively. Plaintiff argues that the ALJ's finding that Plaintiff can only occasionally reach overhead and may not engage in power gripping or power grasping prohibits a finding that Plaintiff could perform fine and gross movements effectively as defined in 1.00B2c.

> Listing 1.00B2c defines "inability to perform fine and gross movements effectively" as:
>
> [E]xtreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

The record before the ALJ indicated testimony that Plaintiff could reach above his head with his left arm and could take care of his own personal hygiene. In addition, the evaluation by Dr. Balfanz in October, 2011, indicates that Plaintiff had only minor reductions in his grip and pinch strength and that Plaintiff's finger abduction, wrist flexion, wrist extension, elbow extension, and shoulder extension were all normal. Accordingly, the ALJ's finding that Plaintiff could perform fine and gross movements effectively, as defined in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.00B2c, was supported by substantial evidence in the record. As a result, the ALJ's conclusion that Plaintiff's impairments, either alone or even in combination, were not

medically equivalent to a major dysfunction of a joint listed in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.02, was also supported by substantial evidence in the record.

**B.    RFC Determination**

Plaintiff also challenges the residual functional capacity (RFC) determination made by the ALJ, arguing that the ALJ erred by not giving controlling weight to the opinion of his treating physician, Dr. Stiles, and by not specifically identifying the examining medical source whose opinion was inconsistent with Dr. Stiles.

1.   Dr. Stiles

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002). However, a treating physician's opinion "do[es] not automatically control, since the record must be evaluated as a whole." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995). An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole. See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991). The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).  In other words, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces her otherwise. See Id.

When an ALJ chooses not to give controlling weight to the opinion of a treating physician, the regulations require that she explain the reasons for doing so. See, 20 C.F.R. § 404.1527(c)(2).

The ALJ stated that she had given little weight to the RFC opinions of Dr. Stiles because they were not supported by other objective medical evidence in the record and, as the ALJ correctly noted, were inconsistent with Dr. Stiles' own earlier treatment notes, which indicated that Plaintiff was experiencing numerous disabling symptoms but also recorded that Plaintiff appeared well and was not in distress. The ALJ also noted that Dr. Stiles' RFC opinion was internally inconsistent as it indicated that Plaintiff should have no limits on fingering and reaching but also indicated that Plaintiff should be limited to doing no fingering. The ALJ also noted that the results of many of Plaintiff's test results were normal, which were inconsistent with Dr. Stiles' opinion that Plaintiff was completely disabled. Finally, the ALJ noted that Dr. Stiles' two letters opining that Plaintiff was disabled were both conclusory and unsupported by any specific references to medical evidence. An ALJ may properly decide to give little weight to the opinion of a treating medical provider on the basis the provider's opinions are inconsistent. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). The conclusory and unsupported nature of a treating physician's opinion is also a basis on which an ALJ may give less weight to the opinion. Rogers, 118 F.3d at 602; Ghant, 930 F.2d at 639. Accordingly, the ALJ's conclusion that Dr. Stiles' disability opinion was not supported by the objective medical evidence in the record was itself supported by substantial evidence, and the ALJ did not err by not giving Dr. Stiles' RFC opinions controlling weight.

2. Opinions of non-examining physicians

Plaintiff next contends the ALJ erred by not specifically identifying another physician who had examined Plaintiff whose opinion was inconsistent with the opinions of Dr. Stiles.

The federal regulations expressly authorize an ALJ to consider the opinion of a non-examining medical consultant, 20 C.F.R. § 416.927(e), as the ALJ did here in relying on the opinions of Dr. Grant, Dr. Richards, and Dr. Armstrong when formulating the RFC determination. "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not *normally* constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999) (emphasis added)). Where the treating doctor's opinion is not itself supported by the objective medical evidence, however, and the ALJ conducts an independent review of the whole record, the ALJ is entitled to rely upon the opinions of consulting physicians. Wagner, 499 F.3d at 849 ("Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." (citing Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000)); see also Thiele v. Astrue, 856 F. Supp. 2d 1034, 1047 (D. Minn. 2012) ("[I]f the ALJ did not rely solely on the non-examining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination.").

The record presently before the Court indicates that the ALJ relied on the opinions of Dr. Stiles, Dr. Armstrong, Dr. Grant and Dr. Richards, and she independently reviewed the whole record, as evidenced by the fact that the ALJ's RFC places significantly greater limitations on Plaintiff's ability to work than those of Dr. Grant and Dr. Richards RFCs but not as great as Dr. Stiles's RFC.[5] As it is evident that the ALJ independently considered the objective medical

---

[5] Dr. Grant's and Dr. Richards' RFC determinations both indicated that Plaintiff could lift twenty-five pounds frequently and fifty pounds occasionally; could stand and sit six hours during an eight hour workday; and

evidence in the whole record when formulating the RFC and rejected portions of Dr. Grant's, Dr. Richards' and Dr. Stiles' opinions, the Court does not find that the ALJ erred by making a RFC determination without specific citation to a treating physician other than Dr. Stiles.

For the foregoing reasons, the ALJ's RFC determination was supported by substantial evidence in the record.

### C.     Ability to Work.

Plaintiff lastly contends that the ALJ erred in determining that Plaintiff could perform past relevant work and other work available in the national economy, arguing that the testimony of the independent vocational expert, William Villa, was based on the RFC of the ALJ, which Plaintiff has argued was not supported by substantial evidence in the record.  As discussed in the immediately previous section, the Court concludes that the RFC determination made by the ALJ was supported by substantial evidence in the record. Section III.B.2, *supra* at 24-25.  As such, independent vocational expert Villa's testimony based on the ALJ's RFC was also supported by substantial evidence in the record as a whole.  Accordingly, the ALJ properly relied on Villa's testimony in concluding that Plaintiff was able to perform his past work and, in the alternative, could perform other work available in the national economy. Pearsall v. Massanari, 274 F.3d 1211, 1220 (8th Cir. 2001) (holding that testimony of an independent vocational expert that a claimant can perform a specific job that exists in sufficient numbers in the national economy constitutes substantial evidence to support an ALJ's disability determination).

---

recommended no postural, visual, manipulative, or communicative limitations. (Tr. 81-82, Tr. 95-96). Dr. Armstrong's disability assessment does not make an RFC determination other than to state that the medical evidence in the record did not support a finding that Plaintiff was limited to sedentary work as recommended by Dr. Stiles. (Tr. 392). The ALJ expressly noted that the ALJ's RFC determination was more consistent with Dr. Armstrong's opinion and the evidence in the record regarding Plaintiff's daily activities than the RFC determinations of Dr. Grant, Dr. Richards, or Dr. Stiles. (See Tr. 19-23).

## IV.      CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, the Court

**HEREBY RECOMMENDS**:

1.  That Plaintiff's Motion for Summary Judgment, [Docket No. 10], be **DENIED** as set forth above; and,

2.  That Defendant's Motion for Summary Judgment, [Docket No. 13], be **GRANTED** as set forth above.


Dated: July 21, 2015                                              s/Leo I. Brisbois
                                                                        Leo I. Brisbois
                                                                        U.S. MAGISTRATE JUDGE


## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.